Lauren M. Rule (ISB # 6863)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
(208) 342-8286 (fax)
lrule@advocateswest.org

Laurence ("Laird") J. Lucas (ISB # 4733)
P.O. Box 1342
Boise, ID 83701
(208) 424-1466 (phone and fax)
llucas@lairdlucas.org

Attorneys for Plaintiff Western Watersheds Project


## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO


| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT; | ) | |
| | ) | CIV. No. 09-629-BLW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S RESPONSE/** |
| | ) | **REPLY IN OPPOSITION TO** |
| | ) | **DEFENDANT'S CROSS** |
| UNITED STATES FOREST SERVICE; | ) | **MOTION AND IN SUPPORT** |
| | ) | **OF PLAINTIFF'S MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Defendant. | ) | |
| _____ | ) | |

## INTRODUCTION

The North Sheep allotments are found in the rugged and beautiful Sawtooth Mountains of central Idaho.  They provide habitat for many species of fish and wildlife, including imperiled species such as salmon, steelhead, bull trout, and sage-grouse as well as other iconic species like wolves and bighorn sheep.  This area is also very fragile because it is in the Idaho batholith, a geologic formation that contains very loose, granitic soils on steep slopes that is prone to erosion.  Due to the area's scenic beauty, rugged mountains, and abundant diversity of fish and wildlife, it is renowned for its recreational opportunities.

These are the reasons that Western Watersheds continues to pursue this litigation.  It is not because they simply want to "thwart" agency action, *FS Brief at 2,* but because they want to protect this highly regarded, beautiful, sensitive and fragile area of central Idaho.  Even though the Forest Service has completed "thousands" of hours and pages of analysis, that analysis has translated to minimal changes on the ground for livestock grazing and thus no protections for many of the species and resources about which Western Watersheds is concerned.[1]

As explained below, the flaws that this Court found in the prior round of litigation persist in the North Sheep Supplemental Environmental Impact Statement ("SEIS"). The Forest Service merely tries to paper-over the problems rather than correct them.  The agency fails to address adequately in the North Sheep SEIS the impacts of grazing and trailing on non-capable lands, restoration of sage-grouse habitat, and how it will insure compliance with Forest Plan direction.

---

[1] The Forest Service is incorrect in stating that Western Watersheds did not seek an injunction pending the SEIS because there was no harm from the proposed action.  *FS Brief at 2.*  In fact, the Court issued an injunction in 2006 limiting grazing on the Smiley Creek allotment, the North Fork-Boulder and majority of the Fisher Creek allotments were rested, and grazing on the Baker Creek allotment was reduced by 45% that year.  Thus, there were significant changes to grazing in 2006 to protect the resources.  The Court also encouraged the parties to work out a plan for 2007 to avoid a further injunction and Western Watersheds heeded that advice.

Thus, the Forest Service continues to violate the National Forest Management Act ("NFMA"),

National Environmental Policy Act ("NEPA"), and the Sawtooth National Recreation Area Act

("SNRA Act").  The agency also refuses to account for new information that is relevant to

impacts of livestock grazing and must be considered under NEPA and the Endangered Species

Act ("ESA") to adequately assess impacts of the proposed action.  Because of these violations,

the Court should grant Western Watersheds' motion for summary judgment and remand the

North Sheep SEIS.

**ARGUMENT**

**I.      THE NORTH SHEEP SEIS VIOLATES NEPA, NFMA, AND THE SNRA ACT.**

> **A.      The Forest Service Did Not Adequately Consider Livestock Capability In
>           The North Sheep SEIS.**

The Forest Service's argument regarding livestock capability is that the capability

analysis is used **only** to determine stocking levels of the allotments and the Forest Service can

ignore the analysis for any other purpose, such as assessing impacts of grazing on these

allotments.  *FS Brief at 4-7.*  This position is not consistent with NFMA and its regulations, or

NEPA's requirement to take a hard look at the impacts of a proposed action.

The Forest Service claims that lands that were not determined to be capable of sustaining

grazing are not actually incapable, and that use of the term "capability" in the regulations is

"unfortunate," suggesting other preferable terms.  *FS Brief at 6.*  The Forest Service cannot

simply redefine or re-label terms in regulations at will, however, and must interpret regulations

consistent with their plain language. *Oregon Natural Resources Council Fund v. Brong,* 492

F.3d 1120, 1125 (9th Cir. 2007).   Nothing in the regulations restricts the use of the capability

determination to setting stocking levels, and in fact the language indicates a larger purpose for it.

NFMA directs the Forest Service to adopt forest planning regulations with guidelines for

"the identification of the suitability of lands for resource management."  16 U.S.C. § 1604(g)(2)(A).

Under this statutory direction, the Forest Service's regulations state that:

> In forest planning, the suitability and potential capability of National Forest System lands for producing forage for grazing animals and for providing habitat for management indicator species shall be determined as provided in paragraphs (a) and (b) of this section.  Lands so identified shall be managed in accordance with direction established in forest plans. . . .
>
> (a) Lands suitable for grazing and browsing shall be identified and their condition and trend shall be determined.  The present and potential supply of forage for livestock, wild and free-roaming horses and burros, and the capability of these lands to produce suitable food and cover for selected wildlife species shall be estimated. The use of forage by grazing and browsing animals will be estimated.  Lands in less than satisfactory condition shall be identified and appropriate action planned for their restoration.

36 C.F.R. § 219.20.

A close look at these regulations show that the Forest Service must identify suitable and capable lands for grazing, and "lands so identified shall be managed in accordance" with Forest Plan direction.  *Id.* § 219.20.  This language shows that only lands that are identified as suitable and capable are to be managed for resource uses, and, thus, lands not identified are not to be managed for those uses but left alone.  It also shows that the capability determination is the first step in making management decisions to achieve Forest Plan direction—decisions often made at the site-specific level that involve consideration of more than just stocking level.

Next, the Forest Service has four tasks with respect to its livestock capability/suitability determination.  It must:  (1) determine the condition and trend of suitable grazing lands; (2) estimate the supply of forage; (3) estimate the use of forage by livestock; and (4) identify lands in less than satisfactory condition and plan appropriate actions for their restoration.  *Id.* § 219.20(a).  These four points show that forage utilization and stocking level is only part of the capability/suitability process (points 2 & 3), and that the process is also used to assist with

PLAINTIFF'S RESPONSE/REPLY BRIEF - 3

determining condition and trend of lands managed for resource use and planning for restoration of those lands that are in less than satisfactory condition (points 1 & 4). The Forest Service's interpretation that use of the capability determination is solely to set stocking levels is inconsistent with the plain language of the regulations and thus does not control. *Oregon Natural Resources Council Fund,* 492 F.3d at 1125. The regulations call for the Forest Service to use the capability analysis when making management decisions about the condition and use of forest lands at the site-specific level.

Moreover, the guidance document cited by the Forest Service in its response brief shows that grazing in non-capable areas is the exception. The Forest Service cites the part of the memo stating that areas determined to be capable in the planning process may not be appropriate for grazing when analyzed at the site-specific level. *FS Brief at 7* (citing AR PR002876). But the very next paragraph of the memo states conversely that in some situations, livestock need not be **prohibited** from areas not identified as capable and suitable. *AR PR002876.* It gives as an example livestock drifting into a forested area that was not identified as capable because of insufficient forage. *Id.* Use of this area would not conflict with other uses, and thus it would not be necessary to **physically prevent** access to that area, there would just be no forage allocation made. *Id.*

This guidance indicates that, in general, non-capable lands should be off-limits and use of those areas prohibited except for limited circumstances where the use would not conflict with other resources. Here, the Forest Service has not even identified areas where grazing or trailing will occur on non-capable lands and whether that use would conflict with other resources such as soils or downslope fish habitat. The location of non-capable lands and reason why they are not capable must be integrated into site-specific management decisions for their use beyond just

PLAINTIFF'S RESPONSE/REPLY BRIEF - 4

stocking levels.

At the very least, the Forest Service must use the capability analysis when assessing impacts of its proposed action under NEPA.  NEPA requires that the agency consider and disclose every significant aspect of the environmental impact of a proposed action in an EIS. *Oregon Natural Desert Ass'n v. BLM,* 531 F.3d 1114, 1130 (9th Cir. 2008); *Earth Island Inst. v. U. S. Forest Service,* 442 F.3d 1147, 1153-54 (9th Cir. 2006).  To fulfill NEPA's goals, the EIS must contain high quality information, as "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  Likewise, "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" and accurately describe baseline conditions of the area to be affected by the action.  *Id.* §§ 1502.15, 1502.24.

The North Sheep SEIS is flawed because the Forest Service did not consider the capability determination in its analysis of impacts.  Certainly information describing the reasons many of the areas in the allotments are not capable, whether grazing or trailing may occur in those areas, and the impacts of that use is relevant information that must be considered **and disclosed to the public** in the North Sheep SEIS.  *Native Ecosystems Council v. U.S. Forest Service,* 418 F.3d 953, 964-65 (9th Cir. 2005) (EIS is deficient where information is misleading or incomplete).  As noted in Western Watershed's opening brief, large portions of the allotments are not capable of supporting grazing, in part because those lands are too steep for grazing and/or have erosive soils.  *WWP Opening Brief at 13-14; SEIS at 45-46; Mitchell Decl. Ex. 5* (Case No. 05-189, Dckt. No. 26).  If the Forest Service is authorizing grazing or trailing across those lands, that use can have significant effects to soils, vegetation, and fish and wildlife habitat.  *AR NS07000-7001, NS07011, NS06899-6904, PR002975-2983; Madden Decl. ¶¶ 10-18* (Case No.

PLAINTIFF'S RESPONSE/REPLY BRIEF - 5

05-189, Dckt. No. 54).

Although the Forest Service claims it assessed effects of grazing generally across the allotments regardless of whether areas were capable or not, *FS Brief at 6-7,* revealing to the public that livestock use would be occurring on non-capable lands that are too steep or erosive for grazing is critical information that cannot be ignored in the SEIS. The Forest Service must disclose that information and consider the impacts of that use in its NEPA analysis to satisfy its "hard look" duty.

The Forest Service's restricted use of its capability analysis solely for setting stocking rates and its accompanying failure to incorporate that analysis into its consideration of environmental impacts in the North Sheep SEIS violates both NFMA and NEPA.

### B.    The Forest Service Did Not Adequately Analyze Capable Sage-Grouse Habitat Or Plan For Its Restoration In The North Sheep SEIS.

The essence of the Forest Service's response to Western Watersheds' claim regarding sage-grouse habitat capability is that the agency can write-off sage-grouse habitat on the North Sheep allotments because there is little habitat and few sage-grouse in the area. Such an approach merely emphasizes why sage-grouse continue to go downhill and are warranted for listing under the ESA. 75 Fed. Reg. 13,910 (March 23, 2010). Sage-grouse habitat on these allotments has already declined by at least 60% compared to historic conditions according to the Forest Service's own analysis, and will decline further under the agency's decision here.

As the Forest Service notes, NFMA regulations require that once the agency identifies lands that are capable of providing habitat for management indicator species ("MIS") such as sage-grouse, it must determine which of those capable lands may be in less than satisfactory condition and identify appropriate actions for restoration of those lands. *FS Brief at 19* (citing 36 C.F.R. § 219.20). The Forest Service identified watersheds on the forest that have sage-grouse

capable habitat and which of those watersheds are in less than satisfactory condition in its Forest Plan MIS Supplement. *AR MIS002167-77.* The agency recognized that the watersheds within which the North Sheep allotments fall are in less than satisfactory condition, having experienced a 60% or greater decrease in sage-grouse habitat from historic conditions. *SEIS at 87.* Yet the Forest Service tries to escape taking necessary actions to restore habitat on the allotments by asserting that these watersheds are not high priority for restoration because there is minimal sage-grouse habitat and only small sage-grouse populations in the area. *FS Brief at 21-22.*

The regulations, however, do not include an exception for lands that have little capable habitat or small MIS populations. 36 C.F.R. § 219.20. Rather, for any lands that are identified as capable habitat but in less than satisfactory condition, the agency **shall** plan appropriate action for their restoration. *Id.* Although the North Sheep allotments are not in high priority watersheds, they do contain capable habitat for sage-grouse that is in less than satisfactory condition and thus the Forest Service must plan appropriate actions for the restoration of that habitat. *SEIS at 85-88.* Even small patches of sage-grouse habitat within a larger landscape may be important for this wide-ranging but imperiled species. 75 Fed. Reg. 13,916-917 (noting that some sage-grouse are migratory and make long movements, some have very large home ranges, and that "[l]arge seasonal or annual movements emphasize the landscape nature of the greater sage-grouse"). Furthermore, because sage-grouse is the MIS for the sagebrush ecotype, its habitat represents other sagebrush obligate species as well and cannot just be dismissed as unimportant. *See SEIS at 84* (describing use of MIS).

Western Watersheds is not arguing that the Forest Service must **immediately** restore this habitat, *see FS Brief at 23,* but that it must at a minimum halt degradation of this habitat and plan restoration actions that will improve it. The first step in planning appropriate restoration

activities is to determine where those activities should occur.  While the Forest Service
completed a MIS capability analysis for the Forest Plan that identified watersheds that needed
restoration of sage-grouse habitat, it did not transfer this analysis to the site-specific level in the
North Sheep SEIS to identify areas of the allotments on which to focus its restoration actions.
Just like with the livestock capability analysis, the Forest Service has violated both NFMA and
NEPA by not explaining on a site-specific basis what areas of the allotments are capable of
providing food and cover for MIS sage-grouse and which of those areas are in less than
satisfactory condition.

The North Sheep SEIS shows that the allotments fall within watersheds that have 0-25%
of their acres as capable sage-grouse habitat, *SEIS at 86,* but then does not display on a site-
specific level where those acres occur on the allotments.  A table in the SEIS showing the total
acres and percent of sage-grouse source habitat on each allotment is not sufficient to fully
analyze in the SEIS and reveal to the public what areas of the allotments are capable sage-grouse
habitat, which of these areas are in less than satisfactory condition, and how livestock grazing
may be impacting those lands.  *SEIS at 87.*  Without this information, the Forest Service is not
relying on and revealing accurate scientific information, in violation of NEPA, and cannot plan
appropriate actions for restoration of sage-grouse habitat on the allotments, in violation of
NFMA.  40 C.F.R. §§ 1500.1(b), 1502.24 (NEPA regulations requiring high quality information,
accurate scientific analysis, public scrutiny, and scientific integrity of EIS analyses); 36 C.F.R. §
219.20 (NFMA capability regulations).

Once the Forest Service has identified lands on the North Sheep allotments that are
capable habitat and need restoration, the second step in the process is to develop plans for
restoration activities.  The Forest Service's response brief asserts that the adaptive management

PLAINTIFF'S RESPONSE/REPLY BRIEF - 8

strategy will restore sage-grouse habitat that remains open to livestock grazing on the North

Sheep allotments. *FS Brief at 24-25.* This approach is seriously flawed, however, because, as

Western Watersheds explained in its opening brief, the Forest Service is not monitoring for key

habitat variables such as grass, forb, and shrub height or condition of seeps and springs and thus

cannot determine if it needs to make adjustments to grazing to improve these habitat features.

*WWP Opening Brief at 20-21;* 75 Fed. Reg. 13,915-16; *AR MIS003183-3185; MIS002632-2643;*

*MIS006882-6883* (all discussing sage-grouse need for tall sagebrush, grasses, and forbs in

nesting and wintering habitat as well as wet areas for brood-rearing). The adaptive management

strategy is useless as the method of protecting and restoring sage-grouse habitat if the agency is

not adequately monitoring impacts of livestock grazing on that habitat.

By not identifying which lands on the allotments are capable sage-grouse habitat in less

than satisfactory condition, and then not monitoring for key sage-grouse habitat features under

the adaptive management strategy, the Forest Service is not planning appropriate actions to

restore sage-grouse habitat, in violation of NFMA.

### C.    The Forest Service Still Has Not Shown That Its Adaptive Management Strategy Insures Compliance With Forest Plan Direction.

The bulk of the Forest Service's response to this claim simply reiterates the information

contained in the North Sheep SEIS and Allotment Management Plans ("AMPs") and offers a few

post-decision examples of adaptive management, but does not address Western Watersheds' key

arguments. *See FS Brief at 11-15.* The Forest Service does not refute that it is not monitoring

for various parameters that are critical for showing compliance with Forest Plan direction on fish

and wildlife, water quality, and soils, and that there is no trigger for when adaptive changes must

occur to respond to problems. The failure to monitor for key variables that were already known

to be problems on these allotments and to include a trigger that will insure necessary changes

PLAINTIFF'S RESPONSE/REPLY BRIEF - 9

renders the adaptive management strategy insufficient to show that grazing is meeting Forest Plan direction.

As explained in Western Watersheds' opening brief, the Forest Service's protocols do not include monitoring for sediment and other fish habitat features, for upland grass, forb, or shrub height, or for soil erosion on steep slopes of the allotments; and the monitoring conducted on the allotments over the past five years confirms that the Forest Service is not monitoring these parameters. *See WWP Opening Brief at 25-29.* The Forest Service does not refute any of that in its response brief. *FS Brief at 11-15.* Although monitoring on the North Sheep allotments may have "increased significantly in recent years," *FS Brief at 12,* an increase in monitoring alone does not equate to compliance with Forest Plan standards. The Forest Service must show that it is monitoring for the resources identified in the Forest Plan as needing protection. The agency has not done that here.

For instance, the Forest Plan identifies fish habitat and water quality as key resources to protect, and specifically mentions reducing sediment delivery to streams on the Smiley and Fisher Creek allotments, in its standards and objectives. *See WWP Opening Brief at p. 27 and n.1 (discussing Forest Plan standards).* The Forest Service acknowledged in the North Sheep 2004 EIS and again in the SEIS that sediment is a problem in many streams on these allotments, particularly the Smiley Creek allotment, and that livestock grazing can accelerate erosion and cause more sedimentation. *AR NS 6834, 6906-6920* (2004 EIS); *SEIS at 56-65, 66, 109.* Yet the Forest Service has provided no evidence in its brief, monitoring protocols or monitoring data that it monitors sediment or instream fish habitat. *FS Brief at 11-15; Baker Creek AMP at 25-27, North Fork-Boulder AMP at 24-25, Smiley Creek and Fisher Creek AMP at 39-41* (monitoring protocols); *AR SA011385, SA011609, SA012201, SA012211* (riparian monitoring data).

PLAINTIFF'S RESPONSE/REPLY BRIEF - 10

The agency has not explained how it can insure it is meeting standards for water quality and fish habitat if it is not measuring sediment or other instream fish habitat components. Simply monitoring streamside riparian parameters and making management adjustments that are intended to avoid or reduce sediment delivery and protect fish habitat is of limited use when there is no corresponding instream monitoring to determine if indeed fish habitat and sediment loads are improving and thereby meeting Forest Plan direction.

The same problem holds true for upland monitoring that does not account for key habitat features of sagebrush species.  The North Sheep EIS and SEIS explained that sage-grouse habitat was degraded on the allotments and that it had declined by at least 60% compared to historic levels.  *SEIS at 87-88; AR NS06884, NS06965-6966, NS06977-6978* (2004 EIS)*; NS05988-5989* (2004 biological evaluation).  The Forest Service, however, does not require monitoring height of sagebrush, grasses, and forbs despite that these are important features for sage-grouse and other sagebrush species, and that the Forest Plan calls for protecting habitat of sensitive species, MIS, (of which sage-grouse is both), and other sagebrush obligate species.  *See Baker Creek AMP at 25-27; North Fork-Boulder AMP at 23-26; Smiley and Fisher Creek AMP at 39-42* (upland monitoring protocols)*; AR MIS003136-3147* (Connelly Sage-grouse Guidelines)*;* 75 Fed. Reg. 13,915 (sage-grouse listing decision discussing habitat needs); *AR SP000154-156, SP000243, SP000284-85* (Forest Plan direction).

The Forest Service does not deny that it does not monitor these parameters, and monitoring data in the record confirms that the agency is not collecting this information.  *See FS Brief at 11-15; AR SA011274-88, SA011419, SA011492, SA011526, SA011924, SA011926, SA011941.*  The Forest Service also has provided no evidence that it monitors sage-grouse populations, contrary to Forest Plan direction and recent Ninth Circuit precedent.  *AR SA000156*

PLAINTIFF'S RESPONSE/REPLY BRIEF - 11

(Forest Plan); *Native Ecosystems Council,* 599 F.3d at 932-35.  By not monitoring for key parameters in sagebrush habitat or for sage-grouse population trends, the Forest Service does not know whether it is meeting or moving toward Forest Plan direction for wildlife or whether it must make adaptive adjustments to grazing to achieve these standards.

And again, the Forest Service offers no evidence in its response to contradict Western Watersheds' argument that the agency is not monitoring soils and soil erosion on steep slopes to insure compliance with soil standards as well as water quality standards.  *WWP Opening Brief at 28-29; FS Brief at 11-15.*  Long-term plots are necessary to evaluate the amount, extent, and trend of soil erosion over time and to monitor whether adjustments to grazing are actually improving soil conditions on the steep slopes of the allotments, but no such plots occur under the current monitoring protocols.  *See Baker Creek AMP at 27, North Fork-Boulder AMP at 26, Smiley Creek and Fisher Creek AMP at 41-42.*  Deference to the Forest Service's selection of monitoring protocols is not warranted when the Forest Service cannot show that its monitoring will insure compliance with Forest Plan standards for fish and wildlife, water quality, and soils.

Finally, the Forest Service does not explain how the adaptive management strategy can insure compliance with the Forest Plan when that strategy is so uncertain.  *See WWP Opening Brief at 23-25; FS Brief at 11-15.*  There is no identified trigger for when the Forest Service will make management adjustments and thus no certainty that such actions will occur at a time and in a manner that will avoid further damage and meet Forest Plan direction.  Furthermore, while it may be beneficial to change protocols as better protocols are developed, *see FS Brief at 14,* the language in the AMPs gives the Forest Service discretion to make changes to protocols, sites, or frequency of monitoring that may not be beneficial if, for instance, it wants to cut down on monitoring due to inadequate staff or funding.

PLAINTIFF'S RESPONSE/REPLY BRIEF - 12

By leaving the adaptive management strategy so uncertain, the Court cannot reasonably

determine that this strategy is sufficient to comply with Forest Plan directives over the long-term.

*See Nat'l Wildlife Fed. v. NMFS,* 524 F.3d 917, 935-36 (9th Cir. 2008) (even sincere commitment

to future mitigation to offset negative effects not enough absent specific and binding plans);

*Native Ecosystems Council,* 418 F.3d at 963 (court must be able reasonably to ascertain from

record that the Forest Service is in compliance with Forest Plan standards).  The Forest Service

has offered no evidence to demonstrate that its adaptive management strategy will insure

compliance with the Forest Plan direction cited by Western Watersheds, in violation of NFMA

and the SNRA Act.

### D.      The Forest Service Failed to Include Relevant New Information In The SEIS.

The Forest Service cannot pick and choose which relevant new information it wishes to

include in an SEIS and which it wants to exclude.  Once an agency embarks on a supplemental

analysis, as it did here, it must reveal all relevant new information in that analysis in order to

fulfill NEPA's twin aims of informed decisionmaking and informed public participation.

*Oregon Natural Desert Ass'n,* 531 F.3d at 1120 (discussing goals of NEPA).  NEPA regulations

state that supplemental statements shall be prepared if there is "significant new information

relevant to environmental concerns and bearing on the proposed action or its impacts."  40

C.F.R. § 1502.9(c).  Information about new noxious weed infestations and climate change are

certainly relevant to environmental concerns and bear on the impacts of livestock grazing and

thus must be included in the SEIS.

The Forest Service acknowledges that the issue of noxious weeds is relevant when

considering impacts of livestock grazing in that it was "appropriately covered" in the 2004 EIS,

which recognized that new weed outbreaks may occur.  *FS Brief at 26* (citing NS007035, 7048-

50).  Yet instead of revealing that new weed outbreaks had in fact occurred in grazed areas on

the allotments in just the four years since the 2004 EIS was issued, the Forest Service simply

"considered" this information on its own and is supposedly using it in weed management actions.

*Id.*  Omitting this information from the SEIS, however, precluded the agency from incorporating

it into the alternatives analysis and discussion of environmental consequences, and revealing that

information to the public, defeating NEPA's primary goals.  *Oregon Natural Desert Ass'n,* 531

F.3d at 1120, 1143 (noting importance of public participation in decision making, and that

alternatives analysis fosters informed decisionmaking and informed public participation).  The

information must be in the SEIS itself, not buried in the project record to be considered only by

the agency.

Similarly, with respect to climate change, the Forest Service also acted unreasonably by

excluding this issue from the SEIS analysis.  Like noxious weeds, climate change is relevant to

environmental concerns and bears on the impacts of livestock grazing because impacts from

climate change affect many of the same resources that grazing affects—i.e. streams, vegetation,

fish and wildlife habitat.  The Forest Service should have considered information on climate

change impacts in combination with livestock grazing impacts in its analysis of alternatives and

environmental consequences of the proposed action.

The Forest Service asserts that it could not include a discussion about climate change in

its SEIS because the impacts are too uncertain and speculative at the local scale, and sheep

grazing does not meaningfully contribute to emissions of greenhouse gases.  *FS Brief at 27-28.*

Regardless of whether sheep grazing directly contributes to global warming, it certainly affects

many of the same natural resources that climate change affects and the Forest Service must

consider those combined impacts to take a "hard look" at its proposed action.  Although impacts

of climate change are not completely known, enough is known to include it within the SEIS analysis.

For instance, there is consensus that climate change is causing warmer air and water temperatures, more drought, and earlier spring peak flows in snow-fed streams. *See* Intergovernmental Panel on Climate Change Synthesis Report (2007), found at http://www.ipcc.ch/pdf/assessment-report/ar4/syr/ar4_syr.pdf; *Declaration of Lauren M. Rule Ex.A* (2007article by Idaho Forest Service scientists noting impacts to bull trout from global warming).   This information was available to the Forest Service when it issued the North Sheep SEIS.  Indeed, numerous Forest Service scientists participated on the Intergovernmental Panel on Climate Change ("IPCC") that won the Nobel Prize in 2007 and issued several reports that year discussing climate change. *Rule Decl. Ex. B* (statement from Forest Service Chief noting contributions of 13 Forest Service scientists to IPCC panel); *IPCC 4th Assessment Reports at http://www.ipcc.ch/publications_and_data/ publications_and_data_reports.htm.*   The leaders of the Forest Service have even emphasized the importance of addressing climate change despite the uncertainty about exact impacts. *Rule Decl. Exs. B & C* (statement of Chief Kimball, paper by former Chief Bosworth).

The lack of complete certainty about the effects of climate change has not precluded agencies from considering those effects in decisionmaking or courts from requiring it in analyses.  For instance, NOAA Fisheries and U.S. Fish and Wildlife Service determined that there was enough known about climate change impacts to consider them a threat warranting listing of coral, polar bears, and the Kittlitz murrelet.  71 Fed. Reg. 26,852 (May 9, 2006); 73 Fed. Reg. 28,212 (May 15, 2008); 73 Fed. Reg. 75,194-95 (Dec. 10, 2008).

Courts have also held in multiple contexts that climate change impacts must be

considered in analyses.  *See Pl. Opening Brief. at 32.*  In one recent case, a court upheld analysis

of global warming impacts in a 2007 SEIS, noting that the SEIS had a chapter on global climate

that considered impacts to various species from climate change.  *Conservation Northwest v. Rey,*

674 F. Supp.2d 1232, 1253 (W.D. Wash. 2009).  Of note, the court stated that "global climate

change comments and studies cited by Plaintiffs undoubtedly present an additional set of

information at which the agencies were bound to take a 'hard look.'"  *Id.*  Even though these

cases do not relate specifically to livestock grazing, the general impacts of climate change are the

same, and when combined with livestock grazing, cause greater cumulative effects to vegetation,

streams, and habitat for fish and wildlife.  As many courts have found, these impacts are not too

speculative or uncertain to include them in the SEIS analysis, and by excluding them the agency

has failed to take the necessary hard look at its proposed action, in violation of NEPA.

Western Watersheds is not arguing that every piece of new information warrants an SEIS,

*see FS Brief at 27,* but where, as here, an SEIS is underway, the agency must include within that

analysis all "new information relevant to environmental concerns and bearing on the proposed

action or its impacts."  40 C.F.R. § 1502.9(c).  New information on the spread of noxious weeds

on the North Sheep allotments and climate change fall within that category and it was arbitrary

and capricious for the Forest Service to exclude it from the SEIS analysis.  By doing so, the

Forest Service failed to insure that it had considered and revealed every significant aspect of the

environmental impact of a proposed action in its analysis.  *Oregon Natural Desert Ass'n*, 531

F.3d at 1130; *Earth Island Institute,* 442 F.3d at 1153-54.

## II.   THE FOREST SERVICE VIOLATED THE ESA BY NOT RECONSULTING WITH THE SERVICES BEFORE ISSUING THE SMILEY CREEK DECISION.

The Forest Service did not reconsult with NOAA Fisheries or U.S. Fish and Wildlife

Service before issuing the Smiley Creek and Fisher Creek Supplemental Record of Decision

("SROD") even though new information relevant to the listed fish species warranted reinitiating consultation over this grazing decision. Information from the livestock capability analysis as well as climate change is relevant for assessing impacts of grazing on the survival and recovery of listed fish and should have been considered in a new consultation before issuing the Smiley Creek and Fisher Creek decision.

The Forest Service claims that the capability analysis is not new information because the analysis "did not change between 2004 and the 2008 SEIS" but, rather, the 2004 EIS simply did not explain the analysis. *FS Brief at 32.* There are two flaws with this argument. First, the Forest Service admitted in the 2004 EIS, and argued strenuously in the previous case, that it did not need to conduct a capability analysis for the North Sheep allotments and thus had not done one. *AR NS 6860* (noting that capability determined at Forest Plan level only); *Case No. 05-189, Docket No. 35-2 at pp. 13-22* (Forest Service opening summary judgment brief). It was only after this Court ruled that such an interpretation of NFMA and its regulations was unlawful and ordered the agency to prepare a site-specific capability analysis did the Forest Service undertake that step. *Case No. 05-189, Docket No.47 pp. 7-16* (Memorandum Decision and Order), *Docket No. 74* (Injunction Order).

To complete that process, the Forest Service had to modify and validate old data to meet the required current capability standards. *SEIS at 43-44.* For instance, the agency had to adjust the forage standard from 50 pounds per acre to 200 pounds per acre and eliminate areas that were too steep or erosive when determining the capable areas of the allotments. *Id.; SA 000858-871* (notes showing units removed from analysis because of low forage production, high bare ground, or steep slopes to match Forest Plan standards); *SA 001104* (summary of analysis stating that had to remove areas that had inadequate ground cover, forage production less than 200 pounds per

PLAINTIFF'S RESPONSE/REPLY BRIEF - 17

acre, or steep slopes).  The capability analysis conducted for the North Sheep allotments may

have been based on field data from before 2004, but it was a new analysis conducted after the

2004 Court ruling and thus is new information.

The second flaw with the Forest Service's argument is that even if the Forest Service was

aware of this information in 2004, it was not revealed to the Services as part of the consultation

process and thus the Services could not use the information when drawing conclusions about

impacts to the survival and recovery of listed fish.  Neither the 2004 EIS nor 2004 Biological

Assessment contained any information or maps regarding capability and thus the Services were

not informed about how much or what areas of the allotments were not capable of sustaining

grazing.  *NS 6823-7190* (2004 EIS), *NS 5866-5970* (BA).  General statements in the 2004 EIS

and BA about possible effects of sheep trailing across steep slopes and Forest Plan direction to

avoid these areas is not a substitute for site-specific information disclosing what areas on the

allotments are too steep or erosive for grazing but will be subjected to sheep trailing across them.

*See FS Brief at 32-34.*  Such information is highly relevant and important for assessing the

impacts of this activity on downslope fish habitat, especially when excess sediment is one of the

key problems for fish on the Smiley Creek allotment.

Other key new information warranting reinitiation of consultation is climate change.  The

Forest Service tries to sidestep this argument by stating that Western Watersheds did not provide

the requisite 60-day notice of this claim as required by the ESA because its notice letter did not

provide a citation to the specific information it wanted the agencies to consider.  *FS Brief at 38.*

Western Watersheds is not asserting, however, that the agencies have to address any particular

studies that they failed to address previously.  Western Watersheds is simply asserting that the

agencies have to include current information on effects of climate change in general in their ESA

analysis, which they failed to do in their 2004 consultation. *NS 05866-5970, SA 1237-1242*

(2004 BA and Letters of Concurrence). Thus, any studies discussing climate change impacts

would be new information that was not considered in 2004. The agencies were on notice that

they could abate the alleged violation by reinitiating consultation and discussing climate change

impacts in conjunction with grazing impacts on the listed fish, and that is all that is required

under the ESA. *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143

F.3d 515, 520 (9th Cir. 1998) (notice must provide sufficient detail about violation so the agency

can identify and attempt to abate the violation).

As to the merits of Western Watersheds' claim, the Forest Service again uses the excuse

that impacts of climate change are too uncertain to include in any analysis. *FS Brief at 39.* As

discussed above, there is strong consensus on several impacts of climate change: air and water

temperatures are increasing, and spring peak flows are occurring earlier in snow-fed streams.

*See Rule Decl. Exs. A & B.* Each of these impacts is cause for alarm for bull trout, salmon, and

steelhead, which need clean, cold water, particularly in summer and fall for spawning and

rearing of juveniles. *See NS 05917, 5920, 5924.* Impacts from livestock grazing can further

degrade habitat by introducing more sediment into streams and reducing streamside shade and

undercut banks, which can lead to wider, shallower streams and higher water temperatures. *NS

05926-5928.* These combined impacts must be addressed in a new consultation to adequately

assess impacts of the action on survival and recovery of the listed fish.

Some uncertainty in the science is not an excuse to ignore the science in ESA

consultations. Agencies must use the "best available science" and cannot avoid their duties

under the ESA by claiming insufficient information. *See Connor v. Burford,* 848 F.2d 1441,

1454 (9th Cir. 1988); *Brower v. Evans,* 257 F.3d 1058, 1070-71 (9th Cir. 2001). This comports

PLAINTIFF'S RESPONSE/REPLY BRIEF - 19

with the ESA's institutionalized caution mandate to give the benefit of the doubt to preserving

endangered species.  *Connor,* 848 F.2d at 1454; *Arizona Cattle Growers Ass'n v. Salazar,* 606

F.3d 1160, 1166-67 (9th Cir. 2010) (citing *Sierra Club v. Marsh,* 816 F.2d 1376, 1386 (9th Cir.

1987)).  As one court recently held, even though climate change impacts are not completely

certain, the agency was required to include discussion of how climate change affected a listed

fish species in a biological opinion.  *Natural Resources Defense Council v. Kempthorne,* 506 F.

Supp.2d 322, 367-69 (E.D. Cal. 2007).

The Forest Service violated the ESA by issuing the SROD for the Smiley Creek and

Fisher Creek allotments without reinitiating consultation with the Services to consider new

information necessary to fully analyze impacts of this decision on survival and recovery of the

listed fish.

## CONCLUSION

For the foregoing reasons, WWP respectfully requests this Court grant summary

judgment in its favor on its First, Second, Third, and/or Fourth Claims for Relief; and reverse

and remand the North Sheep SEIS and SRODs,

Dated: August 31, 2010                    Respectfully submitted,

                                           s/Lauren M. Rule
                                          Lauren M. Rule
                                          Attorney for Plaintiff

PLAINTIFF'S RESPONSE/REPLY BRIEF - 20

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of August, 2010, I electronically filed the foregoing PLAINTIFF'S RESPONSE/REPLY IN OPPOSITION TO DEFENDANT'S CROSS MOTION AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and DECLARATION OF LAUREN M. RULE with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the counsel of record listed below:

Deborah Ferguson
Assistant U.S. Attorney
Deborah.Ferguson@usdoj.gov

John Martin
Assistant U.S. Attorney
John.Martin@usdoj.gov

William G. Myers, III
Holland & Hart
wmyers@hollandhart.com

   s/Lauren M. Rule
Lauren M. Rule

PLAINTIFF'S RESPONSE/REPLY BRIEF - 21