WENDY J. OLSON, IDAHO BAR NO. 7634
UNITED STATES ATTORNEY
**DEBORAH A. FERGUSON, IDAHO BAR NO. 5333**
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 PARK BOULEVARD, SUITE 600
BOISE, IDAHO  83712
TELEPHONE:  (208) 334-1211
FACSIMILE: (208) 334-1414

Attorney for Defendants

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 09-629-BLW |
| | ) | |
| v. | ) | |
| | ) | **THE UNITED STATES FOREST** |
| | ) | **SERVICE'S REPLY** |
| | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF SUMMARY JUDGMENT** |
| UNITED STATES FOREST SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

The Forest Service has fully complied with the Court's direction set forth in its February

2007 Order in the earlier North Sheep litigation, which granted in part, and denied in part, both

Plaintiff's and Defendant's Cross- Motions for Summary Judgment. (Case No. 05-cv-189,

Docket No. 47). A  Management Indicator Species MIS Capability Supplement (USDA 2008a)

was completed in January 2008 to Supplement the Forest Plan, and a Final Supplement to the

North Sheep EIS was prepared in support of the North Sheep proposed action.  Plaintiff's new

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT**
**OF SUMMARY JUDGMENT – PAGE 1**

challenges to those supplemental analyses are without merit. The Court should grant the Forest

Service's Cross Motion for Summary Judgment and deny Plaintiff's Summary Judgment Motion

and close the case. The Declaration of Sharon LaBrecque, Forest Service Planning and

Vegetation Management Staff Officer on the Sawtooth National Forest is also filed in support of

this memorandum.

      **A.**      **The Forest Service fully analyzed and properly considered grazing
capability.**

      Plaintiff's reply brief asserts the North Sheep decisions do not comply with the 1982

Forest Planning regulation found at 36 C.F.R. §219.20. First, it is important to note this

regulation is no longer in effect. *McNair v. Lands Council*, 537 F.3d 981, 989, fn.5 (9th Cir.

2008). (Lands Council addressed the 219.10 regulations and the regulations at 219.20 fall into

the same category). Second, when the regulation was in effect, it only applied to forest plan

level decisions. The plain language of the 1982 regulation 36 C.F.R. §219.20 provided: "In

*forest planning*, the suitability and potential capability of National Forest System lands for

producing forage for grazing animals and for providing habitat for management indicator species

shall be determined..." (*emphasis added).* This regulation never applied to site specific project

level decisions such as the North Sheep decisions Plaintiff challenges here. Instead, to

demonstrate that the project decisions at issue here are in violation of NFMA, Plaintiff must

show that those decisions are inconsistent with the governing plan. This Plaintiff has failed to

do. The Forest Service fully considered the Forest Plan capability analysis, prepared a site-

specific capability analysis, and explained the difference between the two analyses. SA09995-

SA010013.

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT
OF SUMMARY JUDGMENT – PAGE 2**

Next, Plaintiff argues for a new and extremely broad interpretation of 36 C.F.R. § 219.20. It asserts that (1) all lands not identified as potentially capable are therefore not capable and off limits to livestock and (2) the purpose of the capability analysis is not just to set stocking levels, but that the regulations require the Forest Service to use the capability analysis when making management decisions about the condition and use of the forest lands at the site-specific level. This interpretation goes against the plain language of the regulation.

36 C.F.R. § 219.20 provides:

In forest planning, the suitability and potential capability of National Forest System lands for *producing forage* for grazing animals and for providing habitat for management indicator species shall be determined as provided in paragraphs (a) and (b) of this section. Lands so identified shall be managed in accordance with direction established in forest plans.

(a) Lands suitable for grazing and browsing shall be identified and their condition and trend shall be determined. *The present and potential supply of forage* for livestock, wild and free-roaming horses and burros, and the capability of these lands to produce suitable food and cover for selected wildlife species shall be estimated. The *use of forage* by grazing and browsing animals will be estimated. Lands in less than satisfactory condition shall be identified and appropriate action planned for their restoration. . .
*(italics added).*

The over-riding purpose and direction of this regulation is to determine whether national forest lands have potential for producing forage and supplying habitat. This is further supported by the definition of capability which is "the potential of an area of land to produce resources, supply goods and services, and allow resources uses under an assumed set of management practices and at a given level of management intensity." 36 C.F.R. § 219.3.

In accordance with this regulation, the capability analysis provides a conservative estimate of forage that is available in a given area. It does not identify or classify lands into a graze/no graze category that prevents livestock grazing in areas that were not taken into

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 3**

consideration in the capability analysis to estimate forage supply.[1]  Plaintiff's assertion that grazing is to be prohibited on all lands not identified as capable is not supported by the regulations and would have sweeping unintended (or perhaps Plaintiff's intended) consequences.  If the Court were to accept Plaintiff's interpretation it would essentially have the effect of halting much of the grazing on National Forest Service lands because to limit livestock grazing access only to those lands identified as potentially capable for purposes of estimating forage supply would require every parcel of "capable" land to be fenced and livestock to be somehow transported from one disconnected "capable" tract to another. Nowhere does 36 C.F.R. § 219.20 state, or infer, that whether determining stocking levels only lands identified as potentially capable are to be managed for this resource use.

Plaintiff also claims that the North Sheep SEIS is flawed because the Forest Service did not consider the capability determination in it analysis of impacts.  Pl. Response/ Reply Brief, p. 5.  However, Plaintiff is calling for far more than consideration of the capability analysis.  Plaintiff seeks an entirely new analysis that identifies the location of "non capable" lands and the reasons why these lands were not considered capable.  Plaintiff asserts that the Forest Service is required under 36 C.F.R. §219.20 to display the specific criteria for each parcel or polygon of land that filtered that area of land out from being considered as potentially capable for the purpose of estimating forage production and that this information was necessary for a complete effects analysis.

---

[1] The Forest Service also conducts a suitability analysis that identifies lands that are not suitable for grazing, i.e., a campground or high use recreation area.  These lands identified as not suitable for grazing could be closed to grazing in the decision.

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 4**

This is off the mark for four reasons. First, as stated at length in its opening brief, the Forest Service does not identify lands as "non capable." Second, the regulations do not require such an analysis. Third, the Forest Service fully disclosed the criteria used to identify potentially capable lands in both the Forest and site-specific models. SA009995- SA100009. Fourth, the Forest Service fully analyzed and described the impacts of grazing across the entire allotment, not just the lands in the capability analysis. NS6888- NS07078, SA010012-SA010079.

The SEIS described and considered the data from the capability models, the actual use information associated with grazing intensity and grazing patterns along trailing routes, and the evaluations of conditions and effects of grazing on a broad range of Forest resources. All of this information was integrated and used to validate the carrying capacity and management direction for the allotments.

Contrary to Plaintiff's representation, the Forest Service fully analyzed the effects of grazing on the entire allotment. For example, the SEIS considered the impacts of grazing on soils regardless of whether those lands were considered in the capability analysis. The soil specialist used a sampling strategy to ensure adequate coverage of the representative land forms. This analysis displayed the locations and extent for each land-type found in the project area. As an example, Figures 1 and 2 in the Supplemental Soils Report show the land-type distribution across the entire allotments. [2]  NS04381 -NS4382.  A sensitivity

---

[2] The stratified land group and land-type allows for the classification and identification of landforms having similar interpretive properties - physical characteristics that determine soil productivity capabilities and limitation. The

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 5**

assessment using land type capabilities and limitations was used to prioritize data collection efforts and focus the analysis on land types with inherent limitations. NS04386. Further, the effects analysis for fisheries looked at the entire stream system within the allotments not just those segments that fell within potentially capable rangeland. It included an analysis of fisheries distribution, stream composition, and allotment habitat summary. NS06924-NS06935, SA0010015.

In sum, the Forest Service properly prepared and considered the Forest Plan and site-specific capability analyses, fully disclosed this information to the public, and prepared a complete effect analysis that identified and disclosed the impacts of this project on the various resources. The Forest Service has complied with its obligations under NFMA and NEPA and its North Sheep Decisions should be upheld.

**B.      The Forest Service has fully analyzed capable sage-grouse habitat and has not only planned for its restoration, but has taken specific action to improve and restore this habitat.**

Plaintiff also claims that the Forest Service has violated NFMA and NEPA because it failed to prepare a site-specific management indicator species (MIS) capability analysis at the project level that identifies where the sage grouse habitat exists within the four North Sheep allotments. However, neither NFMA nor NEPA requires the Forest Service to prepare a site-specific capability analysis for MIS. When 36 C.F.R. § 219.20 was in effect it required the Forest Service to identify lands capable of providing food and cover for MIS, identify the

---

spatial distribution of the land groups and land-types are displayed using Geographic Information Systems (GIS) data. NS04386.

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 6**

lands in less than satisfactory condition, and plan for restoration of those lands. This requirement is at the Forest Plan level, not the project level. As with the grazing capability analysis, the Forest Service is to consider this information at the project level and if new or more specific information warrants adjustments than those changes need to be adequately identified and explained. There is no regulation, and Plaintiff can point to none, that requires the Forest Service to prepare an entirely new MIS capability analysis at the project level.

The Forest Service fully met the requirements of 30 C.F.R. § 219.20 and properly considered and applied this information at the site-specific level during the preparation of the SEIS. Contrary to Plaintiff's assertion, the record for the MIS supplement and the SEIS include GIS data and detailed maps of sage grouse habitat, which display where the MIS habitat is located on the four North Sheep allotments. SA000572, MIS01115, MIS00117. The map located at SA001166 displays where the MIS capable habitat exists on the four North Sheep allotments. Because these watersheds were identified as having a 60% or greater decrease in sage grouse habitat, the habitat displayed in the map at SA001166 is considered to be habitat in less than satisfactory condition. As a result, the Forest Service prepared a MIS capability analysis at the Forest Plan level, transferred or refined the Forest Plan information to the site-specific level, and properly considered and disclosed the information to the public.

Second, Plaintiff claims that the Forest Service failed to plan for the restoration of the MIS habitat that was identified in less than satisfactory condition. Plaintiff alleges that since the Forest Service has prioritized its restoration efforts it has therefore written-off the sage

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 7**

grouse habitat located within the North Sheep allotments. Plaintiff further claims that the sage grouse habitat will "decline further under the agency's decision here." However, simply because the Forest Service determined the North Sheep allotments were not a high priority for restoration of sage grouse habitat does not mean that it is doing nothing to improve and restore sage grouse habitat within the four North Sheep allotments.[3]

As pointed out by Plaintiff itself, the regulations do not require the Forest Service to immediately restore all habitat identified in an unsatisfactory condition. It requires the Forest Service *to plan* for that restoration. That is exactly what the Forest Service has done both at the broad forest-wide scale as well as the site specific level for the North Sheep allotments. As set forth in the Forest Service's cross motion for summary judgment, the Forest Plan's restoration strategy wisely prioritized areas identified in unsatisfactory condition for restoration. MIS002182-MIS002184. The watersheds where the North Sheep allotments are located were not identified as a high priority for restoration due to the very small amount of habitat that exists in these allotments and the fact that these areas are not occupied by sage grouse. This does not mean that areas not identified as a high priority have been ignored.

The Forest Service took into consideration the condition of the sagebrush communities and the need for restoration of these communities when determining what changes to the allotment grazing systems needed to be made. NS07194- NS07197, NS07209-NS7214, SA010047-SA010054, SA010077-SA010079. These are some of the

---

[3] As described in the SEIS, the Forest Plan does include specific direction for restoration of sage grouse habitat in the watersheds within which the allotments. SP000243, SP000284-SP000285.

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 8**

ways the Forest Service has taken specific action to ensure that sage grouse habitats within the North Sheep allotments are maintained and the habitat improved. Specifically, the Forest Service has closed 12% of the acres identified as sage grouse habitat to grazing in the Smiley Creek allotment. Use of the Murdock corral has also been curtailed and the Smiley Creek corral is being rested until important habitat indicators improve. SA010077, NS07209-NS07210. Further, as discussed in more detail below, sagebrush habitat is being very actively monitored by the Forest Service to ensure that the habitat continues to improve. SA010150-SA010122, SA010196-SA010198.

Finally, as set forth in the Declaration of Sharon LaBrecque, Forest Planning and Vegetation Management Staff Officer on the Sawtooth National Forest, the Forest Service has implemented and completed seventeen restoration projects that fall either partially or wholly within the North Sheep allotments which have aided in the restoration of sage grouse habitat. This activity reflects what the Forest Service is accomplishing on the ground to benefit sage grouse habitat in this area, outside the arena of grazing authorizations. For example, in 2008 the Forest Service implemented conifer encroachment treatments in the Smiley Creek and North Fork Boulder allotments. The purpose of these treatments was to retain meadow and sagebrush openings in order to provide habitat diversity for native wildlife species, including the sage grouse. In addition, numerous user created routes and dispersed recreational sites have been closed and obliterated in order to reduce stream sedimentation, restore wetlands and riparian vegetation, and establish natural drainage. *See* LaBrecque Declaration, Exhibit 1.

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 9**

In short, the Forest Service has planned for the restoration of the sage grouse habitat and prioritized its plan of action it its Forest Plan. It has also implemented several restoration projects in the allotment areas that contribute to the improvement and restoration of the sage grouse and other habitats within the North Sheep allotments.

### C.   The Forest Service has fully explained the adaptive management strategy and established a comprehensive monitoring plan to ensure grazing activities are consistent with the Forest Plan.

Plaintiff's key argument challenging the adaptive management strategy is that it disagrees with the monitoring the Forest Service is conducting. Plaintiff complains that the Forest Service is not monitoring for various parameters that are critical for showing compliance with Forest Plan direction on fish and wildlife, water quality, and soils. This is an inaccurate representation and not supported by the record. The Forest Service has an extensive monitoring plan in place, which ensures that the key components associated with fish and wildlife, water quality and soils, among other resources, are properly monitored in order to ensure compliance with Forest Plan standards.

Section II of each Allotment Management Plan (AMP) lists the Forest Plan forest-wide goals, objectives, desired conditions, and Management Area objectives for range management. It then identifies the allotment specific desired conditions, goals, and objectives that were developed to address the broader forest plan direction. SA010099-SA010103. Section VII of the AMPs include detailed descriptions of the types of monitoring protocols that will be used on each allotment.

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 10**

The Forest Service is monitoring fish habitat, water quality, riparian areas, upland mesic riparian areas, sage brush and non forested uplands, and aspen stands on each allotment. SA010118-SA010123, SA00147-010153, SA010193-SA010208. Monitoring protocols established for fish habitat and water quality include multiple indicator monitoring (MIM), which collects information on riparian vegetation, stream bank alteration and stability, stubble height, and woody species use. SA012475-SA012495. This data is used to determine if grazing activities are accelerating bank erosion, causing channel down cutting, reducing deep-rooted bank vegetation, increasing sediment sources and/or damaging fish habitat. SA010119-SA010121, SA010149-SA010150, SA010195-SA1011096.

Plaintiff took particular exception to the fact that the Forest Service does not monitoring sedimentation and instream fish habitat. However, simply monitoring the sedimentation and instream fish habitat, as proposed by the Plaintiff, would only inform the Forest Service of sedimentation levels and instream habitat conditions. It would not indicate what caused the sedimentation to increase or the instream habitat condition. The type of monitoring conducted by the Forest Service not only identifies the condition of the resource, but it focuses on the effects caused by grazing activities, thus informing the Forest Service how a specific grazing system is impacting the resource.

For example, the MIM protocol provides information that informs the Forest Service if grazing is accelerating bank erosion, causing channel down-cutting, reducing deep-rooted bank vegetation, increasing sediment sources near stream channels and damaging fish habitat. This data is used as a surrogate measurement for sediment sources caused by

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 11**

grazing, channel stability, and impacts to fish habitat. SA04371 - SA04519. The monitoring conducted by the Forest Service provides the data necessary to determine what adjustments to grazing activities are needed reduce impacts that may have occurred. SA010117, SA010147, SA010193.

For sagebrush communities, the Forest Service uses nested frequency, line intercept, photo point, and stubble height protocols. SA010150-SA010151. The data obtained from these monitoring protocols is used to determine species composition, percent sagebrush canopy cover, forage production, soil cover, soil erosion, and percent cover and composition of grass, forbs, and shrub species. MIS007277-MIS007278. The line intercept protocol is recognized as having greater accuracy and precision than other methods (Higgins et al. 1994) and is widely accepted as a method for estimating shrub canopy cover. MIS007278. In addition, aspen stands, another component of sage grouse habitat, are monitored focusing on aspen regeneration, aspen browsing, domestic vs. wild ungulate use, and ground cover. SA010152. All this data collected is used to establish resource conditions and trends with respect to achievement of desired conditions identified in the Forest Plan, North Sheep FEIS, and AMPs. SA010120, SA010150, SA010196.

Plaintiff may disagree with the type of monitoring the Forest Service is conducting and indeed think that more monitoring should be done. However, the record demonstrates that the Forest Service has established a comprehensive and effective monitoring system that provides the data necessary to determine the condition and trend of the resources and to make

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 12**

timely adjustments to grazing activities where and when problems arise, ensuring that Forest Plan standards are met.

Finally, the adaptive management strategy is not uncertain. There is a specific cause and effect system to adaptive management that is explained at length in the SEIS. SA009975-SA009986. The SEIS lists and describes examples of probable actions that would be considered and implemented under adaptive management, as well as citation to the agency's authority to take those potential adaptive management actions. SA009981-SA009986. Chapter 4 of the SEIS on Environmental Consequences describes how implementing this process and these actions will meet Forest Plan direction. SA010070, SA010074 - SA010079. The effects of adaptive management are also discussed in the SEIS. SA010055-SA010061.

The Forest Service has fully described and disclosed to the public the adaptive management strategy, in compliance with its obligations under NEPA.

**D.    The Forest Service was not required to include a lengthy climate change discussion in the SEIS.**

Plaintiff asserts that the Forest Service acted unreasonably by not including the issue of climate change in the SEIS. Under NEPA, the Forest Service has an obligation to take a hard look at the environmental effect of a project. As with any environmental impact, greenhouse gas emissions and carbon cycling should be considered in proportion to the nature and scope of the federal action in question and its potential to either affect emissions or be affected by climate change impacts. "Inherent in NEPA and its implementing

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 13**

regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any potential new information to the decision making process." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d. 60, 66 (D.C. Cir 1987) ("[T]he NEPA process involves an almost endless series of judgment calls. . . . The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."

In a decision issued earlier this week, *Hapner v Tidwell*, 2010 WL 3565255 (9th Cir. 2010) the Ninth Circuit affirmed the district court on all but one issue in a NEPA and NFMA case against the Forest Service. The court specifically considered and rejected the plaintiff's argument that the Forest Service violated NEPA by failing to discuss global warming in its analysis. The project at issue authorized logging on up to 810 acres and prescribed burning on an additional 300 acres. The Service designed the project, in part, to reduce likely fire intensity, to improve habitat diversity, and to reduce the risk of insect infestations and tree diseases. *Id.* at *1. The Ninth Circuit acknowledged the Deputy Chief for the National Forest System has issued a guidance document directing the Service to incorporate climate change analysis into its evaluations of projects. "That guidance document suggests, for example, that a qualitative discussion of climate change would be necessary in an EA for a proposal to underburn 30,000 acres of ponderosa pine stands. It states, however, that proposals require no discussion if they are of a "minor scale [so] that the direct effects would be meaningless." *Id.* at *4.  The court noted the project involved a relatively small amount of land and it would thin rather than clear cut trees. Further, it recognized that the Forest Service addressed comments regarding climate

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 14**

change in its December 2007 notice of final decision. The court concluded that the Forest Service adequately considered the project's impact on global warming in proportion to its significance.

Likewise, the Forest Service was not required to address climate change at length in the Supplement North Sheep EIS, as the grazing Decisions on four allotment would have a insignificant impact of global warming. As stated by the Council on Environmental Quality, "[m]ost important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b). Plaintiff's demand that the climatic impacts of the grazing on these four allotments flies in the face of this regulation and the very purpose of the NEPA. There is no factual basis to support the assertion that impacts to climate change are 'truly significant to the action in question". It is not possible to link summer sheep grazing on the four allotments in question to quantitative effects on climatic patterns. Climate change is not a significant issue when viewed in the context of these four sheep allotments and therefore is not a significant issue warranting detailed analysis in the SEIS.

**E.     The Forest Service's decision to not reinitiate consultation over authorization of grazing in the two allotments is reasonable and complies with the ESA.**

Plaintiff's response brief maintains that the Forest Service should have reinitiated consultation under the Endangered Species Act ("ESA") before completing its analysis on remand. Although Plaintiff continues to argue that "information from the livestock capability

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 15**

analysis" and the anticipated effects of climate change necessitate reinitiation of ESA section 7 consultation, its brief fails to address critical dispositive arguments presented by the Forest Service in its opening brief. Pl. Resp. Br. at 16-17. Most importantly, the Forest Service has made an express decision that reinitiation of consultation was not warranted, and Plaintiff utterly fails to address how this decision is arbitrary or capricious under the applicable deferential standard of review under APA section 706. Plaintiff instead argues, in essence, that the Court should ignore the plain language of the very regulation underlying its claim, as well as established prerequisites to bringing a citizen suit under the ESA.

Before turning to those main points in more detail, it bears noting that Plaintiff's brief does not address at all its prior contention that the Forest Service's monitoring protocols represent "new information" that would obligate the Forest Service to reinitiate consultation. That omission should be taken as a concession that this argument lacks merit for all the reasons set forth in the Forest Service's opening brief. FS Br. at 34-37. This brief will not address that particular contention any further.

The next basis Plaintiff proffers as support for its reinitiation claim is that the Forest Service's capability analysis is new information. Pl. Resp. Br. at 16-17. Even though Plaintiff concedes that the agency's analysis was based on data that was available before the 2004 consultation, it contends that the analysis is new. This contention is premised on irrelevant distinctions between the Forest Plan capability analysis and allotment specific analyses. As the

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 16**

Forest Service explained in its Supplement to the Record of Decision[4], it had performed both levels of analyses in the course of producing its 2004 North Sheep FEIS. AR SA010375. The new North Sheep Supplement merely "discloses the crucial data relied upon in its grazing capability analysis and explains how the data was analyzed and used in its grazing capability determination for these allotments." Id. The Forest Service did validate the data for the 2008 SEIS, but that validation only served to confirm and support its previous findings.

More importantly, Plaintiff fails to address why these analyses, regardless of their vintage, meet the standard that would trigger reinitiation. The reinitiation standard that Plaintiff relies upon calls for a reinitiation of consultation where "new information *reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered.*" 50 C.F.R. § 402.16(b) (italics added). Plaintiff's argument ignores everything in that standard after the first two words "new information," and hence fails to show how the capability analysis reveals effects that may affect listed species "in a manner or to an extent not previously considered." Plaintiff may not presume such effects, but at this stage of these proceedings must prove the Forest Service's contrary determination to be arbitrary. Because Plaintiff has failed to supply any argument on this critical aspect of its claim, it should be rejected.

Instead of making this required showing, Plaintiff argues that a new round of consultation

---

[4] Plaintiff also errs in its response brief when it states that the Forest Service issued a "Supplemental Record of Decision" and implies that this was a new decision by the Forest Service. Pl. Resp. Br. at 16-17. As the document's true title notes, it is a "Supplement to the Record of Decision for the North Sheep Final Environmental Impact statement" and merely affirms that the 2004 Record of Decision "is still valid and remains unchanged" after consideration of the North Sheep Supplement and related materials. AR SA010373-74.

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 17**

is required because the regulatory agencies at NOAA and the Fish and Wildlife Service may never have seen this information. Pl. Resp. Br. at 18. Of course, this is not the standard outlined by regulation. Moreover, this line of argument presents an impermissible collateral attack on the sufficiency of the informal consultation process and determinations completed in 2004. The adequacy of the 2004 consultation is not before the Court for direct judicial review in a reinitiation claim such as presented here. This argument also lacks any foundation because the regulatory agencies' administrative records of the information they considered in 2004 or thereafter (such as in the 2009 informal consultation over steelhead critical habitat) are not before the Court. In light of the fact that informal consultation includes all discussions and communications amongst the agencies, 50 C.F.R. § 402.02, Plaintiff has no basis to argue that the prior consultation failed to consider how grazing capability might affect fish habitat. As explained in our opening brief, the 2004 consultation expressly included consideration of actual and potential impacts on listed species or designated habitat from sheep's use of all lands within the allotments, including those lands not designated as capable. That fact alone defeats Plaintiff's claim here.

The Plaintiff's final argument is that any and all information "on effects of climate change in general" is new information that warrants reinitiation. Pl. Resp. Br. at 18-20. Importantly, Plaintiff concedes that it "is not asserting, however, that the agencies have to address any particular studies that they failed to address previously." Id. at 18. This concession dooms Plaintiff's claim on its merits because it demonstrates that Plaintiff has not proven what it must to establish that the requirements of 50 C.F.R. § 402.16(b) have been triggered, i.e. that

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 18**

"new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."

Given that Plaintiff has declined to point to any particular studies, it fails to satisfy its burden because it is that "new information," under the regulation, that must reveal certain types of "effects of the action." 50 C.F.R. § 402.16(b).  That is to say, the regulation requires a direct causal relationship between the new information and effects - one must reveal the other - and also requires that  those effects have other requisite qualities, such as that they are caused by the action, and may affect the species in "a manner or to an extent not previously considered." Id. Plaintiff ignores its duty to prove any of these causal relationships.  The failure to identify specific "new information" is thus fatal to its claim because, without specifying the new information at issue, it becomes impossible to prove (or disprove) that it is the narrow type of new information that triggers reinitiation under section 402.16(b).  For example, the claim here fails because climate change is not (nor alleged to be) an effect of the grazing authorization at issue in this case.  Plaintiff's brief even admits this failure in noting that Plaintiff seeks an assessment of the "effects of climate change in general" and "climate change impacts." Pl. Resp. Br. at 18-19.  But section 402.16(b) only requires reinitiation to assess "effects of the action," not any and all effects on listed fish or their habitat regardless of cause.   Plaintiff's claim here fails on the merits because it has failed to provide the simple factual information required by the regulation, choosing instead to rely upon a theory of reinitiation that would require the agency to reopen consultation every time new information comes to light and regardless of the materiality

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 19**

of the information or effects at issue.  That theory has no basis in 50 C.F.R. § 402.16(b).[5]

For these same reasons, Plaintiff's notice letter is also deficient, and the Court lacks jurisdiction over this claim.  The law is clear that the agency is "not required to play a guessing game" as to "precisely what it allegedly did wrong, and when" and accordingly, the notice letter must specify with particularity the alleged violation; failure to strictly comply with the notice requirement mandates dismissal.  Center for Biological Diversity v. Marina Point Dev., 535 F.3d 1026, 1032-33 (9th Cir. 2008) (noting that where letter provides notice of one specific violation, defendant "not required to speculate as to all possible attacks that might be added to a citizen suit."), amended on other grounds, 560 F.3d 903 (9th Cir. 2009);  See Hallstrom v. Tillamook County, 493 U.S. 20, 26-28 (1989) (notice requirements cannot be avoided by employing a flexible construction and failure to strictly comply required dismissal).  Here a plain reading of the notice letter compels the conclusion that Plaintiff's mention of climate change therein was so cursory and devoid of particulars that it failed to alert the Forest Service as to why it was in violation of 50 C.F.R. § 402.16(b).

The Forest Service reasonably concluded that, above and beyond consultation over potential impacts to steelhead critical habitat, it need not reinitiate consultation regarding its decision to authorize grazing in these two allotments for a ten year term (half of which has now elapsed) pursuant to revised allotment management plans.  Plaintiff has failed to demonstrate

---

[5] The documents on climate change Plaintiff submitted with its response brief support the Forest Service's assessment that it is not presently feasible to incorporate the projected effects of climate change (such as meteorological changes) into its analyses of the actions at issue here due to issues of scale and timing.  See Docket # 6-2, page 11 of 14 (application of most climate models at the watershed and landscape scale "problematic") and

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 20**

how that decision is arbitrary or contrary to the reinitiation regulation at 50 C.F.R. § 402.16(b).

Plaintiff's claim is so bereft of support that the Court lacks jurisdiction over one of Plaintiff's theories of a violation, and Plaintiff has failed to provide any support in its reply brief for another of its theories. Accordingly, the ESA claim should be dismissed.

DATED this 17th day of September, 2010.

WENDY J. OLSON
United States Attorney


DEBORAH A. FERGUSON
Assistant United States Attorney

---

Docket 26-4, page 3 of 17 (forecasting climate change at regional level "just starting to yield results" and still uncertain).

**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 21**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of September, 2010, the **THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Lauren Rule
lrule@advocateswest.org

Murray D. Feldman
mfeldman@hollandhart.com

Laurence ("Laird") J. Lucas
llucas@lairdlucas.org

John H. Martin
John.h.martin@usdoj.gov

William Gerry Myers, III
wmyers@hollandhart.com


Janis Malm
Legal Assistant


**THE UNITED STATES FOREST SERVICE'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT – PAGE 22**