IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHED PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>Defendant. | Case No. CV 09-629-E-BLW<br><br>**MEMORANDUM DECISION** |

## INTRODUCTION

The Court has before it cross motions for summary judgment. The Court heard oral argument, and took the motions under advisement. For the reasons set forth below, the Court will grant the motion filed by the Forest Service and deny the motion filed by WWP.

## LITIGATION BACKGROUND

The Court set forth much of the factual background of this litigation in a prior decision, and will not repeat that in detail here. *See WWP v. U.S.*, *CV-05-189-E-BLW (Memorandum Decision, Dkt. 47).* In that decision, the Court found that the Forest Service violated NFMA, NEPA, and the Sawtooth National Recreation Act (SNRA) in

**Memorandum Decision - 1**

preparing the North Sheep Environmental Impact Statement (NSEIS). The NSEIS was prepared to evaluate the Proposed Action of allowing certain levels of grazing on four allotments – known as the North Sheep allotments – within the Sawtooth National Forest and the Sawtooth National Recreation Area.

The Court found that the Forest Service violated these statutes because (1) it ignored Forest Plan capability findings in setting grazing conditions; (2) it failed to conduct an analysis in the Forest Plan of the capability of rangelands to provide habitat for Management Indicator Species (MIS) sage-grouse and pileated woodpecker; and (3) it failed to fully explain the Adaptive Management Strategy and its protocols. The Court found in favor of the Forest Service on issues involving Bighorn Sheep, the Sheep Driveway, and Q Fever.

To address these shortcomings in the NSEIS and Forest Plan, the Forest Service prepared two environmental reports. The first – a supplement to the Forest Plan – contained a capability analysis for the MIS pileated woodpecker and sage-grouse. The second – a supplement to the NSEIS entitled "Final Supplement to the North Sheep Final Environmental Impact Statement" (SEIS) – addressed the Court's concerns with the NSEIS.

WWP has filed this lawsuit challenging both the SEIS and the supplement to the Forest Plan, alleging that they fail to answer the Court's concerns.

**STANDARD OF REVIEW**

The Court's review of NFMA challenges is governed by the Administrative

Procedures Act (APA) because NFMA contains no express provision for judicial review. See *Native Ecosystems Council v. United States*, 418 F.3d 953, 961 (9th Cir. 2005). Under the APA, the Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although this standard is a "narrow one," the Court is required to "engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review." *Native Ecosystems*, 418 F.3d at 961. To have not acted in an arbitrary and capricious manner, the agency must present a "rational connection between the facts found and the conclusions made." *Id.*

Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans. *Id.* However, an agency's interpretation "does not control where . . . it is plainly inconsistent with the regulation at issue." *Id.* Moreover, an agency's position "that is contrary to the clear language of a Forest Plan is not entitled to deference." *Id.* at 962.

The Court's review of NEPA challenges is also governed by the APA. In reviewing the adequacy of an Environmental Impact Statement (EIS) under NEPA, the Court applies the "rule of reason" standard, which "requires a pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation." *Id.* at 961. The Court must ensure that the agency has taken a "hard look" at the potential environmental consequences of the proposed action. *Id.*

**Memorandum Decision - 3**

**Capability & Suitability**

In preparing the NSEIS, the Forest Service estimated what areas of the forest were capable of sustaining grazing based on five characteristics of the land at that time: (1) accessability to livestock, (2) forage production, (3) slope, (4) soil stability, and (5) distance to water. Three of the North Sheep allotments had 15% or less of their land found capable, and one allotment had 25%.

The NSEIS did not discuss these capability figures or take them into account in setting specific grazing conditions on the four allotments. The Forest Service made maps of the capable lands, but only used them internally and did not display or discuss them in the NSEIS. While the Forest Service was proposing to graze 30% of the North-Fork Boulder allotment, only 15% of that allotment contained capable ground. *NS07005*. Likewise, the Forest Service proposed to graze 29% of the Smiley Creek allotment while only 13% of the allotment contained capable ground. *Id.*

What did these figures mean? On their face, they meant the Forest Service was grazing the allotments beyond their capacity to support grazing. Perhaps there was some other explanation, but the Forest Service provided none in the NSEIS. *See Memorandum Decision Dkt. 47, supra*. The Court found that this lack of explanation in the NSEIS violated NFMA and NEPA. The Court did not hold that lands found not capable were off-limits to grazing. *See Memorandum Decision Dkt. 47* at 15 ("lands identified as

incapable are not forever off-limits to grazing").[1] Even if land was "found incapable at the forest plan level, it may still be grazed if site-specific studies show actual conditions support grazing. Conversely, land found capable may become off-limits if warranted by later site-specific studies." *Id.* at 16. The Court found that "the Forest Service may rely more heavily on the site-specific studies than the capability figures in setting grazing levels for specific allotments". *Id.* at 12.

The SEIS answered the Court's concerns first by including maps of both "capable" and "suitable" lands, that were missing from the NSEIS. *SA10063-64.* Moreover, it discusses site-specific studies – referred to as Range Analysis or REA – and concludes that they added another 7,400 acres of land that could actually support grazing. *SA10006-07.* While the REA data is at least 10 years old, the Forest Service concludes that it "remains very accurate and is a better description of capable rangelands that what was described in the Forest Plan level model." *SA10006.* The Forest Service used the REA data to calculate the number of acres that are suitable for grazing in each of the four allotments. *SA10065.* These suitable acres were compared with the acres on which grazing was authorized. *Id.* For each allotment, the acres authorized for grazing are less than the acres deemed able to support grazing under the site-specific REA studies. *Id.* The Forest Service concluded that "[t]hese levels of grazing use are within allotment specific tentative grazing capacities for [the proposed alternative]." *Id.*

---

[1] The Forest Service points out that no lands were identified as "incapable." The Court was merely referring to any lands not found "capable."

**Memorandum Decision - 5**

This conclusion – based on the evaluation of site-specific studies – answers the Court's concern that the original NSEIS appeared to be authorizing grazing well in excess of the capacity of the allotments to sustain grazing. The SEIS shows that the authorized grazing does not exceed the actual suitable acres in each allotments.

But to get to suitable grazing areas, the sheep must often be trailed over land not deemed capable of supporting grazing. WWP accurately points out that the SEIS did not "include any maps or discussion about where trailing across non-capable land should occur, why those lands were deemed not capable of sustaining grazing, and what the impacts of trailing across those non-capable lands would be." *Pft's Brief Dkt. 17* at 13. The EPA shares WWP's concern. In commenting on the draft SEIS, the EPA notes that sheep could be trailed over areas with steep slopes and/or unstable soils:

> The capable and suitable lands are dispersed and discontinuous within the allotments. Consequently, it is likely necessary that bands of sheep must traverse substantial areas of incapable and unsuitable lands to access the various suitable lands. We are concerned about potential impacts to the environment that could be caused by disturbing these unsuitable lands. There is no information included about the amount, type, condition, and vulnerabilities of the incapable and unsuitable lands that would be traveled and potentially grazed and/or damaged by the sheep bands.

*SA006444*.

The record shows that trailing will occur over lands that have not been found capable. The Forest Service maps depict the capable areas as small islands surrounded by much larger areas of land not found capable. *SA10008-09*. A significant part of the lands found not capable were so designated due to steep slopes and/or erodible soils. *See*

**Memorandum Decision - 6**

*Mitchell Declaration at Exhibit 5*.[2] To move from one small patch of capable area to the next, sheep will have to be trailed in many cases over steep and/or erodible lands, which could dislodge soils and increase sediment flow into streams. *NS6880.* The SEIS found that "[u]pslope sources of sediment include exposed areas with minimal vegetation that contribute to surface runoff and detachment of soils, such as roads, trails, land developed for mining purposes and localized areas of livestock grazing." *SA10021.* The problem is acute in the Smiley Creek and Fisher Creek allotments where streams are already "considered to be functioning at risk or functioning at unacceptable risk" due to high sediment loads. *NS6879.*

The significance of this problem is magnified by the fact that the Forest Service – as will be discussed further below – is not monitoring for sediment in the streams. Instead, its monitoring will focus on the condition of streambanks, stream channels, and riparian areas.

Contrary to WWP's argument, however, the Forest Service addresses this problem in the SEIS. The Forest Service recognizes that sedimentation can come from many sources other than grazing, and so attempts to isolate, identify and remedy those conditions caused by grazing that lead to sedimentation. First and foremost is riparian

---

[2] Exhibit 5 to the Mitchell Declaration was prepared with Forest Service GIS data. It was relied upon by the Court in its prior decision over an objection that it was outside the administrative record. *See Memorandum Decision Dkt. 47* at 10. The Court found that material prepared with the Forest Service's own data, data that was used to create the NSEIS, could be examined even though outside the administrative record. *Id.* The Forest Service did not object to WWP's discussion of the map in the briefing in this case.

**Memorandum Decision - 7**

grazing, that tramples streambanks and destroys stream-side vegetation. As will be discussed below, the Forest Service is monitoring riparian areas to avoid this source of grazing-caused sedimentation.

Sedimentation is also caused by upland grazing and trailing on steep slopes and erodible soils, causing sediments to wash down into streams. The SEIS addresses these upland sources of sediments as well. For example, in the Allotment Management Plans (AMP) for the Smiley Creek allotment – approved by the SEIS – the Forest Service requires that "the design of the [trailing] routes will ensure that no area of an allotment receives substantial grazing by livestock more than once per season ('once-over grazing')." *SA10177.* To avoid over-grazing, the AMP contains a plan to rotate grazing annually between different drainages in the allotment. *Id.* More specific restrictions are imposed on sensitive areas within the allotment. *SA10178* ("[b]etween the confluence of Mill Gulch, downstream to the Forest boundary, restrict all sheep activity (grazing, trailing, bedding, and nooning) to the Smiley Creek road . . . or the area west of the road").

Perhaps most importantly, the Forest Service requires that the permittee provide, every two weeks, "information on the location and timing of the sheep band, grazing, bedding, nooning, watering sites, stream crossing sites, and on herder camp location . . . ." *SA10180.* The Forest Service will "monitor conditions in areas known to contribute sediment loads including upslope areas . . . ." *NS6880.*

During the 2008 grazing season, the Forest Service was actively monitoring the

**Memorandum Decision - 8**

Smiley Creek and Fisher Creek allotments. *SA12398 to 12420.* Forest Service staff inspected the Smiley Creek allotment "at least once a week, but in most cases twice a week throughout the 2008 grazing season." *SA12403.* In the nine week period that the sheep were on the allotment, "there were at least fourteen different communications between the agency range personnel and the permittee or permittee's manager." *Id.* This monitoring of grazing and trailing is intended, according to the SEIS, "to evaluate compliance with Forest Plan and annual management direction." *SA10012.* The SEIS recognized that "[k]nowledge of current use patterns (grazing and trailing routes) and use intensities are the core of this problem." *Id.*

When this monitoring identifies problems, through trigger-points discussed below, the AMPs give the Forest Service authority to modify permits, reduce grazing, and alter trailing routes, among other consequences. *SA10187.* The Forest Service concluded that this monitoring "would help minimize the potential for sediment production and transport to streams." *SA10074.*

The Court will discuss in more detail below the monitoring specific to riparian sites. In summary, it is designed to improve stream-bank stability and build up stream-side vegetation. The Forest Service concluded that this improved vegetation would "increase the ability of this vegetation to trap and retain soil that has previously entered Smiley Creek." *Id.* Thus, in addition to monitoring upland erosion, the plan to improve stream-side vegetation will trap upland erosion that otherwise would enter the streams.

WWP has raised justifiable concerns about sedimentation caused by sheep trailing

**Memorandum Decision - 9**

over steep slopes and erodible soils in upland areas found not capable. However, the Forest Service's ambitious monitoring program will identify problem areas and alter trailing routes, reduce grazing, or take other action to avoid sedimentation.

**Adaptive Management Strategy**

The NSEIS concluded that "the existing grazing system does not comply with the management direction provided" in the SNF Forest Plan. *NSO6825*. To improve conditions – and align grazing management with the Forest Plan as required by NFMA – the Forest Service adopted the adaptive management strategy (AMS). In its earlier decision, the Court found that "[t]he keystone of the [AMS] is monitoring . . . ." *See Memorandum Decision Dkt. 47 at 22*. Yet the NSEIS nowhere explained the strategy or protocols behind the monitoring. The Court concluded that "[t]he failure to explain the strategy and protocols [of the monitoring provisions of the AMS] in the NSEIS violated NFMA." *See Memorandum Decision Dkt. 22 at 22*.

The SEIS contains a much more detailed explanation of the AMS and its monitoring protocols. The SEIS explains that the Forest Service will monitor certain key natural conditions known as Annual Indicators. *See SA 10105*. The Annual Indicators are expressed in terms of goals to improve specific range conditions at pre-designated sites. For example, riparian sites on the Baker Creek allotment have end-of-grazing-season goals of (1) more than 4 inches of stubble height, (2) less than 20% bank alteration, (3) less than 25% woody utilization, (4) late seral conditions, and (5) bank stability equal to 79% on one site and 74% on the other. *SA10120-21*. Upland sites on

**Memorandum Decision - 10**

the same allotment have end-of-season goals of (1) less than 30% sagebrush cover, and (2) more than 70% soil cover. *SA10121*.

The failure to meet these goals will have consequences, as the SEIS points out. *SA9982*. Those consequences include modifications of seasons of use, reductions in the numbers of livestock allowed to graze, and closure of certain areas, among other options. *Id.* To determine the consequence, forest managers examine "the significance of the deviation from meeting" the Annual Indicators. *SA10056*. Where actual conditions are "very close" to desired conditions, only minor adjustments may be needed. As an example of "very close" compliance, the SEIS offers an example where the actual stubble height is 3.5 inches instead of the desired 4 inches. *SA10057*. But if the stubble height is only 2 inches when it should be 4 inches, "significant adjustments" will be required. *Id.*

The AMS does not monitor stream sediment levels. WWP argues that the Forest Service "has not explained how it can insure it is meeting standards for water quality and fish habitat if it is not measuring sediment or other instream fish habitat components." *Plf's Reply Brief* at 11. In fact, however, the SEIS does explain a program to reduce grazing's contribution to stream sedimentation.

The SEIS explains that sediment levels in the streams are coming from various sources, and that the measurement of those levels does not necessarily reveal grazing's contribution. As discussed above, grazing typically causes sedimentation by (1) stream-side degradation and (2) upland erosion. The latter was fully discussed above. The former is the focus of the AMS, which monitors the condition of riparian vegetation,

**Memorandum Decision - 11**

streambank stability, and stream channel displacements. The degradation of these conditions is typically caused by grazing and leads directly to sedimentation. *SA9991*.

In a Technical Bulletin, entitled "Monitoring Stream Channels and Riparian Vegetation – Multiple Indicators," the Forest Service explains how monitoring the conditions of riparian vegetation, streambanks, and stream channels, will improve water quality and fish habitat by identifying problems caused by livestock grazing. *SA4374 to 4376*. The Forest Service found that the AMS monitoring program will reduce sediment loads through "increases to soil stability and density of vegetation cover and root biomass." *SA10074*. This monitoring designed to improve riparian areas compliments the monitoring discussed earlier designed to mitigate upland erosion. Together, the programs will, according to the SEIS, "help to minimize the potential for sediment production and transport to streams." *SA10074*.

The selection of criteria for monitoring is a matter within the expertise of the Forest Service. In determining whether this selection was arbitrary or capricious, the Court must "make a thorough review of the record" while at the same time giving some deference to an agency's determination in an area involving a "high level of technical expertise." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377-78 (1989).

The Court's review of the record convinces it that the Forest Service has carefully considered the monitoring standards – a matter within its technical expertise – and is strongly committed to conducting monitoring and improving range conditions. For this reason, the Court cannot find that absence of sedimentation monitoring is arbitrary or

**Memorandum Decision - 12**

capricious.

WWP also argues that the Forest Service fails to monitor the height of sagebrush, grasses and forbs despite the fact that these are important features for sage grouse, an MIS species. The Court will discuss this argument in connection with the next section dealing with the MIS analysis.

## MIS Capability

In its earlier decision, the Court held that 36 C.F.R. § 219.20 required the Forest Service to conduct a capability and suitability determination for a threatened species like the bull trout, and for MIS pileated woodpecker and sage-grouse. In addition, for these species, the regulation required the Forest Service to identify lands in less than satisfactory condition as habitat and plan appropriate action for their restoration. *See Memorandum Decision Dkt. 47* at 19. With regard to the bull trout, the Court held that the SNF Forest Plan and its accompanying FEIS contained a detailed discussion of habitat and improvement strategies, sufficient to pass muster under NFMA. With regard to the pileated woodpecker and sage-grouse, however, the discussion was far shorter, and the Court found it insufficient under NFMA.

The Forest Service responded by filing a supplement to the Forest Plan EIS. *MIS2151 to 2267*. The Forest Service then used this Forest-wide document to prepare an allotment-specific MIS capability analysis for the North Sheep allotments. *SA10047-54; 10077-79*.

The Forest Plan MIS Supplement states that 60 of the 64 watersheds that comprise

**Memorandum Decision - 13**

the SNF historically provided habitat for the sage-grouse.  *SA10048*.  All four of the North Sheep allotments were in less than satisfactory condition because their sage-grouse capable habitat declined by at least 60% compared to historic levels.  *SA10050-51*.  Grazing is listed as the fifth most important threat to sage-grouse habitat, the first being invasive weeds.  *MIS2172*.

Most of the sage-grouse habitat is found in areas south of these four allotments.  Of the total acres in the North Sheep allotments, only about 8% comprise capable sage-grouse habitat.  *SA10050*.  Because of that distribution of habitat, and being unable to restore all land at once, the Forest Service identified 19 watersheds in that southern area to be designated as high-priority areas for restoration.  *MIS2184 (figure 5); MIS2226* (setting forth Forest Service explanation that unless it set priorities, its efforts would be "diluted across such a large area . . . minimiz[ing] any real progress toward restoring degraded habitat conditions").  The four allotments do not fall within these high-priority watersheds.  Nevertheless, the Forest Service has plans to restore the sage-grouse habitat on the North Sheep allotments.

Part of that plan involves closing to grazing about 12% of the existing sage-grouse habitat.  *SA10077*.  But the main part of the plan is the AMS program.  The Forest Service concluded – in its site-specific MIS analysis – that "grazing closures and [AMS] would effectively move sagebrush communities towards desired condition, thereby contributing to the restoration of lands in less than satisfactory condition for MIS."  *SA10079*.  As this less-than-ringing language signals, grazing closures and the AMS

**Memorandum Decision - 14**

program are not the total answers: "While . . .[AMS] will result in a trend towards desired conditions, some vegetative communities such as the sagebrush steppe may not return to the original community without vegetation manipulation projects or wildfire." *SA10078*. Those more aggressive vegetation manipulation efforts are focused on the 19 high-priority watersheds for the time being.

The Court's original decision identified the flaw in the NSEIS as a lack of detailed discussion of the habitat for the sage grouse and pileated woodpecker. With these supplemental reports – the Forest Plan MIS Supplement, and the MIS evaluation contained in the SEIS – the Forest Service has now provided the level of detailed analysis that the Court found lacking in the NSEIS. This analysis is akin to that applied to the bull trout in the NSEIS, an analysis the Court found sufficient under NFMA in its initial decision.

WWP argues, however, that the Forest Service has failed to make the required efforts to restore sage grouse habitat because significant areas of sagebrush habitat remain open to grazing, and the degraded habitat areas have not been identified. The governing regulation – [36 C.F.R. § 219.20](#) – requires that "[l]ands in less than satisfactory condition shall be identified and appropriate action planned for their restoration."

The Forest Plan MIS Supplement and the MIS analysis in the SEIS do identify lands that are in less than satisfactory condition. *MIS2174-75; SA10047-54*. The documents also contain a plan for restoration – discussed above – as required by the regulation.

**Memorandum Decision - 15**

WWP argues, however, that a critical part of the restoration plan – the AMS program – is not monitoring key sage-grouse habitat components like the conditions of wet areas and the height of grass, forbs, and sagebrush, to ensure they meet sage-grouse needs. The height of herbaceous cover is "an important characteristic of sage-grouse nest sites." *MIS7283*. While the Forest Service is not monitoring for these heights, it is conducting line intercept and nested frequency studies to monitor important aspects of sage-grouse habitat.

Sage-grouse require cover from predators, and that cover is often provided by sagebrush overstory or "shrub canopy cover." *MIS7278*. One of the most common methods to measure shrub canopy cover is by the line intercept technique, *id.*, the technique chosen for use by the Forest Service. It involves stretching a tape out and measuring the amount of the live shrub canopy intersected by an imaginary vertical plane that is bisected lengthwise by the tape. *Id*. The amount of total shrub intersecting the line is tallied and then divided by the length of the line. *Id*. This technique is "widely accepted" and "has greater accuracy and precision than other methods." *MIS7279*.

The Forest Service also monitors for nested frequency, examining the presence or absence of various shrubs and forbs on a quadrant by quadrant basis. *SA10121*. It also measures ground cover, which is the percentage of material, other than bare ground, covering the land surface. *Id*.

To comply with NFMA, the "Forest Service's method for measuring the existing amount of [sage-grouse] habitat [must be] reasonably reliable and accurate." *See Native*

**Memorandum Decision - 16**

*Ecosystems Council v. Tidwell*, 599 F.3d 926, 933 (9th Cir. 2010). The Court finds that the Forest Service has satisfied that standard. While the height of sagebrush, grasses and forbs is important, the Court finds that the Forest Service's substitution of other criteria for height is neither arbitrary nor capricious. The 2006 Idaho Sage-Grouse Conservation Plan, an authoritative work cited by this Court in prior cases, and found in the administrative record of this case, states that "[m]ost habitat assessments for sage-grouse include estimates of one or more of the following: cover, height, density, frequency, and visual obstruction for individual plant species or groups of species." *MIS7274*. The Forest Service has chosen to focus on cover and frequency; the Conservation Plan does not single out height as being indispensable to monitoring. If anything, it is canopy cover – a criteria monitored by the Forest Service's line intercept method – that is most critical: "Canopy cover is the attribute most often measured to characterize sage-grouse habitat." *Id.*

The Court must defer to the Forest Service decisions that are made at a "high level of technical expertise." *Marsh,* 490 U.S. at 377-78. Here, the selection of criteria to measure habitat is a technical one, requiring knowledge of the scientific literature in the field. The Court's review above shows that the Forest Service's decision has support in the literature and hence is entitled to deference. Accordingly, the Court finds that the Forest Plan MIS Supplement, and the MIS evaluation contained in the SEIS, answer the Court's concerns expressed in its earlier decision and show that the Forest Service did not act in an arbitrary or capricious manner.

**Memorandum Decision - 17**

### Invasive Weeds and Climate Change

WWP challenges the lack of discussion in the SEIS of invasive weeds and climate change, and argues that the Forest Service should have consulted again over new information revealed since the NSEIS. Consultation over listed species – and discussion of invasive weeds and climate change – is required if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." *See* [50 C.F.R. § 402.16(b)](). The Court cannot find that the record shows new information on listed species, invasive weeds or climate change that would require discussion in the SEIS, or further consultation under the ESA. Accordingly, the Court rejects these claims.

### Conclusion

The AMS monitoring program is the keystone to the Forest Service's decision to authorize these levels of grazing. The Court has seen in other circumstances – with other agencies – a failure to carry out monitoring, often due to lack of funding. The EPA shares this concern: "[W]e are concerned about the likelihood that the [Sawtooth National Forest] and the [Sawtooth National Recreation Area] will be able to obtain adequate funding to carry out compliance and effectiveness monitoring needed for implementation." *SA6444*.

The Court and the EPA share this concern because the AMS program, as described in the SEIS and AMPs, is aggressive, and will require a large-scale investment of time and effort by the Forest Service staff. That means it will require plenty of funding.

If the record raised question about funding or commitment, the Court would not hesitate to find the Forest Service's decision to rely on the program to be arbitrary and capricious. But the record shows just the opposite, at least in the Smiley Creek and Fisher Creek areas, where the Forest Service was conducting weekly inspections.

Of course, a burst of monitoring accomplishes little. The ambitious AMS program is depicted in the SEIS as being applied consistently and insistently over a long period of time, with teeth. There are consequences for grazing failures, and they must be applied swiftly. This is an area where wildlife is valued over livestock, according to the SNRA. If the actual monitoring program does not live up to this depiction, WWP remains free to challenge the program. On this record, however, the Court cannot find that the Forest Service's decision to rely so heavily on the AMS program to be arbitrary or capricious.

Accordingly, the Court finds that the Forest Service is acting consistently with the Forest Plan in allowing grazing on the four North Sheep allotments. Moreover, the Court finds that the Forest Service has taken the requisite hard look at the environmental impacts of grazing. The NSEIS, as supplemented by the SEIS, does not violate NFMA, NEPA, or the SNRA.

For these reasons, the Court will grant the motion filed for summary judgment filed by the Forest Service and deny the motion filed by WWP. The Court will issue a separate Judgment as required by Rule 58.

DATED: **January 29, 2011**



/s/ B. Lynn Winmill
Honorable B. Lynn Winmill
Chief U. S. District Judge